**GRANT; and Opinion Filed November 20, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01166-CV

### IN RE AMY DUPRE CASANOVA, Relator

**Original Proceeding from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-13-13293-Z**

## MEMORANDUM OPINION
Before Justices O'Neill, Lang, and Brown
Opinion by Justice O'Neill

Relator Amy Casanova filed this petition for writ of mandamus contending the trial court abused its discretion in modifying the agreed temporary orders in this case.[1] We grant the petition.

### I. PROCEDURAL AND FACTUAL CONTEXT

This petition for writ of mandamus arises in a suit affecting the parent-child relationship in connection with the divorce of the child's parents, Amy Casanova (Mother) and Mark Casanova (Father). The parents separated in March 2013 when the child was four years old. Until the time of her parents' separation, the child had resided in Dallas, Texas for substantially all of her life. When the parents separated, Mother moved from the marital residence in Dallas

---

[1] Relator's complaint broadly requests that the Court order the trial court to vacate its September 11, 2014 Order Modifying Agreed Temporary Orders. Because relator complains only of the portions of the order modifying conservatorship, possession and access to the child who is the subject of this case, we address only those portions of the order.

to Tulsa, Oklahoma, where Mother's family resides. The parents agreed the child would reside with Father in Dallas for the remainder of that school year and Mother would visit the child in Dallas every weekend. The parents further agreed once the school year ended they would share possession of the child in Tulsa and Dallas on an alternating weekly basis during the summer and once the school year resumed the child would attend preschool in Tulsa with Mother having possession of the child in Tulsa from Monday through Thursday and Father having possession of the child in Dallas from Thursday through Sunday.

The parties ultimately agreed to temporary orders signed by the trial court January 29, 2014. The agreed temporary orders included a parenting plan appointing the parents joint managing conservators with Mother having the exclusive right to designate the child's primary residence in either Tulsa or Dallas until further order of the court. The agreed parenting plan gave both parents, subject to agreement with the other parent, "the right to make decisions concerning the child's education."

The agreed temporary orders became effective immediately upon signing and applied to all periods of possession on and after the date the trial court signed the possession order. The duration paragraph of the possession portion of the agreed temporary orders provided the periods of possession so ordered would apply while the child was under eighteen and not otherwise emancipated. The possession order addressed holiday possession through spring break in the year 2014, but did not specifically allocate holidays beyond spring break 2014. The possession order provided Mother would have the right to possession of the child at all other times not specifically designated in the possession order.

In accord with the agreed temporary orders, the child attended preschool in Tulsa. She took ballet lessons, made friends in the neighborhood and was selected by lottery to attend a

magnet school. Father participated in the decision to enter the lottery to attempt to obtain a place in the Tulsa magnet school. In April 2014, upon receiving notice the child had been selected to attend the magnet school, Mother enrolled the child in kindergarten at the magnet school for the school year beginning in August 2014.

In June 2014, Father moved to modify the temporary orders requesting the child's primary residence be limited to Dallas and that the child be ordered to attend school in Dallas beginning in the fall of 2014. The motion was first heard by an associate judge who granted Father's request and ordered the child's residence restricted to Dallas County. The order of the associate judge did not grant either party the right to determine the child's primary residence, but specified "child to primarily reside with Father" and abated Father's child support. Mother sought de novo review in the trial court.

The trial court conducted an evidentiary hearing on the motion for modification of the temporary orders. The trial court ordered beginning not later than January 1, 2015, the child's residence and domicile would be restricted to Dallas County and if Mother did not relocate to Dallas County by that date Father would have the exclusive right to designate the primary residence of the child in Dallas beginning at noon on January 1, 2015. The order further provided for possession during the 2014 Thanksgiving and Christmas holidays, granted Father weekend possession of the child and Mother possession at all other times not otherwise addressed in the order, and specified if Mother did not relocate to Dallas County by January 15, 2015, Mother would have the right to weekend possession and Father would have the right to possession at all other times. In a memorandum preceding the issuance of the temporary orders, the trial court characterized its order as making Father, the "primary parent" if Mother chose not to relocate.

## II. AVAILABILITY OF MANDAMUS REVIEW

Mandamus relief is available when the trial court abuses its discretion and there is no adequate remedy at law. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). A trial judge has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). A clear failure by the court to correctly analyze or apply the law will constitute an abuse of discretion. *Id.*

The supreme court has counseled that a party is not entitled to mandamus relief upon a simple showing that it will be subject to delay, inconvenience or expense if it is required to await correction of the trial court's error on appeal. *Id.* at 843. Rather, mandamus review is more appropriately reserved for trial court errors that "elude[] answer by appeal" and which forever deprive a party of a right that cannot be restored by reversal on appeal. *In re Prudential,* 148 S.W.3d at 138 ("To deny Prudential enforcement of the jury waiver by mandamus is to deny it any remedy at all.").

The order in this case is such an order. With limited exceptions not present here, a trial court's temporary orders in a suit affecting the parent-child relationship cannot be appealed. TEX. FAM. CODE ANN. § 105.001(e) (West 2014). Because temporary orders are not appealable, mandamus is an appropriate remedy when a trial court renders temporary orders that improperly cause a party to lose substantial rights as a result of the enforcement of the order. *In re Cooper,* 333 S.W.3d 656, 659 (Tex. App.—Dallas 2009, orig. proceeding) (order modifying agreed temporary order requiring return of children to Dallas during pendency of divorce was a proper subject for mandamus where mother's employment was in North Carolina).

Mother's ability to designate the child's primary residence in Tulsa is a substantial right under the facts of this case. "[T]he right to establish the primary residence of the child factors significantly in the power of relocation." *Doncer v. Dickerson*, 81 S.W.3d 349, 361 (Tex. App.—El Paso 2002, no pet.). Under the terms of the trial court's order if mother wishes to retain the ability to designate the child's primary residence – to remain the "primary parent," in the words of the trial court – she must return to Dallas, possibly without having secured employment. As in *Cooper*, here the trial court's modification of the agreed temporary orders places Mother on the horns of a dilemma. She must either seek a new job in Dallas so she can retain the ability to designate the child's primary residence and remain the "primary parent," or she must allow Father to become the "primary parent" so she can retain her job in Tulsa. An appeal of this order after final judgment, even if permissible, would come too late to restore to Mother the rights she will lose in the interim and would not provide her with complete relief. Accordingly, this is an appropriate case for mandamus review.

### III. STANDARD FOR MODIFICATION OF TEMPORARY ORDERS

In her petition for writ of mandamus, Mother contends a party seeking modification of temporary orders concerning conservatorship, possession, or access to a child must meet the evidentiary requirements established under chapter 156 of the family code. Section 156.101 allows a court to modify an order appointing a conservator of a child, an order providing terms and conditions of conservatorship, or providing for possession and access to a child if the modification would be in the best interest of the child and the circumstances of the child, a conservator, or other party affected by the order have "materially and substantially changed" since the rendition of the earlier order. TEX. FAM. CODE ANN. § 156.101(a) (West 2014). Section 156.102 further requires, among other things, a party seeking modification of the exclusive right

to determine the primary residence of a child within one year of the rendition of an order designating a person with the exclusive right to designate the primary residence of the child to establish the child's present environment may endanger the child's physical health or significantly impair the child's emotional development. TEX. FAM. CODE ANN. § 156.102(c) (West 2014).

We do not agree the evidentiary requirements applicable in cases under chapter 156 are implicated in cases seeking modification of temporary orders. *See Hamlet v. Silliman,* 605 S.W.2d 663, 664–65 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ). *Hamlet* was a suit for termination of the parent-child relationship and adoption. The trial court had appointed the child's aunt temporary managing conservator until further order of the court. *Id.* at 664. The trial court subsequently modified its order and appointed the child's mother managing conservator. The aunt argued section 14.08[2] of the prior version of the conservatorship portions of the family code required proof:

> [T]he circumstances of the parties, including the child, had so materially and substantially changed since the entry of the order that the retention of appellant as managing conservator would be injurious to the welfare of the child and that the appointment of appellee as the managing conservator would be a positive improvement for the child.

*Id.* The Houston court of appeals disagreed, concluding, "the evidence necessary to support a modification of a final order appointing a managing conservator is not required in order to modify a temporary appointment. . . ." *Id.* 664–65.

We agree and conclude chapter 156, like its predecessor, does not apply to modifications of temporary orders. Chapter 156 is predicated on the doctrine of res judicata. *In re S.N.Z.*, 421

---

[2] Prior to April 20, 1995, section 14.08, contained in title 2 of the family code, governed modifications of conservatorship orders. In 1995, the Texas Legislature recodified the family code by repealing title 2, as that title existed before April 20, 1995, reenacting title 2 without the repealed provisions, and adding title 5. Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113. Chapter 156 is in the current title 5.

S.W.3d 899, 911-12 (Tex. App.—Dallas 2014, pet. denied); *Watts v. Watts*, 563 S.W.2d 314, 316 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.). "The policy behind this requirement is to prevent constant litigation with respect to the children, which, of course, would not be in the children's best interest." *Watts*, 563 S.W.2d at 316; accord *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000) (noting modification of final conservatorship orders raises policy concerns regarding stability for the child and the need to prevent constant litigation in child custody cases). Temporary orders, however, as their name suggests are intended to allow a trial court some degree of flexibility during the pendency of a proceeding. The policy concerns regarding finality of judgments and the cessation of custody litigation are not implicated in the same way by modifications of temporary orders because at the time of their entry or modification the litigation concerning the child is ongoing. For that reason, the family code expressly sets forth a different test by which the propriety of temporary orders and any modifications of temporary orders are to be measured, namely whether the temporary orders are for "the safety and welfare" of the child. TEX. FAM. CODE ANN. § 105.001(a).[3]

## IV. ANALYSIS OF TRIAL COURT'S ACTION

Where a child will live and go to school concerns the welfare of the child, *Cobb v. Musslewhite,* 728 S.W.2d 118, 120 (Tex. App.—Tyler 1987, no writ), so temporary orders affecting either the child's residence or education must comply with the requirement of section 105.001(a) that they be for the safety and welfare of the child.[4] The evidence at the hearing suggested that the child is happy and thriving under the current custodial situation. Although

---

[3] A court's power to make temporary orders for the safety and welfare of a child also expressly includes the power to modify prior temporary orders. TEX. FAM. CODE ANN. § 105.001(a).

[4] Cases considering temporary orders and modifications of temporary orders conflate the "safety and welfare" standard of section 105.001 with the" best interest of the child" standard, which section 153.002 of the family code identifies as "the primary consideration" in determining issues of conservatorship, and possession and access to the child. *See, e.g., Cooper*, 333 S.W.3d at 660; *In re Vernor*, 94 S.W.3d 201, 211 (Tex. App.—Austin 2002, orig. proceeding).

Father expressed concern Mother had recently become less communicative and failed to advise him of an incident at the child's school that resulted in brief contact with child protective services, the record before the Court reveals these concerns did not, however, rise to the level of establishing a threat to the child's safety or welfare.[5] Thus, our analysis must turn on whether the trial court's order can be construed as enhancing the child's safety or welfare. We conclude it cannot. While some change of the agreed orders was undoubtedly necessary because the Monday through Thursday and Thursday through Sunday possession schedule set forth in the agreed temporary orders is not a workable schedule for a school-age child, the trial court was required to measure each change it imposed, particularly the geographic restriction on the child's primary residence during the pendency of the divorce, against the yardstick of whether the change was necessary for the child's safety and welfare.

Whether in the context of the resolution of permanent conservatorship, possession or access or in the context of entry or modification of temporary orders, "[w]e give wide latitude to a trial court's decision on custody, control, possession, and visitation matters." *Jacobs v. Dobrei*, 991 S.W.2d 462, 463 (Tex. App.—Dallas 1999, no pet.). Suits affecting the parent-child relationship are intensely fact-driven and no bright line test can be formulated for application in all cases. *Lenz v. Lenz,* 79 S.W.3d 10, 14 (Tex. 2002); *Cooper*, 333 S.W.3d at 660. The fact-driven nature of temporary orders does not mean that trial courts may rely completely on their own ad hoc determinations of what best serves the safety and welfare for the child, however. Rather, a trial court's order must comport with the legislatively pronounced public policy guidelines that apply in all suits affecting the parent-child relationship. *Lenz,* 79 S.W.3d at 14;

---

[5] Father also argues the fact Mother opposes a custody evaluation also provides a basis for the trial court's order. Father does not suggest that Mother's opposition to the custody evaluation is an attempt to hide conduct that endangers the safety or welfare of the child. Thus, we cannot conclude Mother's opposition to the custody evaluation represents a basis for modifying conservatorship, possession or access to the child.

*Cooper*, 333 S.W.3d at 660. Those public policy imperatives are statutorily articulated as follows:

> (a) The public policy of this state is to:
>
> (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
>
> (2) provide a safe, stable, and nonviolent environment for the child; and
>
> (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

Tex. Fam. Code Ann. § 153.001 (West 2014).

Although temporary orders are not subject to the evidentiary standards of chapter 156, in assessing the need for and the proper extent of any modification of a temporary order, in the absence of evidence the existing situation endangers or is harmful to the child, the policy imperatives articulated in the family code require a trial court to give high priority to stability of the child's living situation. "A court abuses its discretion in imposing temporary orders without due regard for the current living situations of the parties, *especially* the stability of the child's current living situation, and without regard for the financial or practical ability of the parties to comply with the court's orders." *Vernor,* 94 S.W.3d at 210 (emphasis in original); *accord Cooper*, 333 S.W.3d at 660 (trial court abuses its discretion when it misapplies the law and fails to weigh properly the required factors in modifying agreed temporary orders governing the residence of a child).

Our decision in *Cooper* provides a useful framework for analyzing the appropriateness of modifying existing temporary orders to impose a limitation on the residence of a child in a situation where a parent is employed elsewhere. In *Cooper* pursuant to agreed temporary orders during the pendency of a divorce, the mother had moved with the children to South Carolina to complete her medical education. *Cooper*, 333 S.W.3d at 658. When she graduated, she sought

–9–

employment in Dallas, but was unable to find a job. *Id.* She sought, pending trial of the divorce case, to modify the temporary orders to allow relocation with the children to North Carolina, where she had obtained employment. *Id.* The trial court refused the modification and ordered the children returned to Dallas. *Id.* at 659. Noting the law favors residency restrictions that allow a parent to relocate when the proposed relocation will significantly improve the custodial parent's economic circumstances to the child's benefit, we concluded the trial court abused its discretion in restricting the residence of the children to Dallas because the trial court's temporary orders would require the mother to choose between maintaining custody of her children or giving up the only job she had been offered in her field. *Id.* at 661.

Just as in *Cooper* here the trial court failed to take into account the practical and financial effect of its orders. But the situation here is even more compelling than the situation in *Copper*. In *Cooper*, the mother sought to relocate the children from their prior residence in South Carolina to North Carolina. Thus, many of the factors that lend stability to a child's life would be altered regardless of the outcome in *Cooper*. In *Cooper* the children would be required to attend a new school, participate in new extracurricular activities and make new friends as a result of the mother's move. In this case, in contrast, Mother simply wishes to retain the status quo with regard to the child's primary residence.

The trial court's decision limiting the child's residence to Dallas cannot be construed as one that promoted stability in the child's life. Although prior to Mother's move to Tulsa the child had lived in Texas for the vast majority of the first four years of her life, the reality of the current living situation is, by agreement of the parties, for the last year and a half the child has had a parent in both Tulsa and Dallas with whom the child has spent nearly even amounts of

–10–

time.[6]   The child has developed a life in Tulsa that includes a home with her mother, enrollment in school, regular participation in extracurricular activities, and frequent contact with extended family members and local friends.   Under the trial court's order, none of these facets of the child's life remain stable.

In entering temporary orders, a trial court is required to attempt to avoid disrupting the child's education.  *Vernor*, 94 S.W.3d at 211.  The trial court's order has precisely the opposite effect.  It mandates a disruption in the child's education.  Instead of rendering an order that would have allowed the child to attend only one school during the year, the trial court required a mid-year transition from the child's school in Tulsa to a new school in Dallas.  The trial court's order would require this five and a half year old child to attend her fourth school in three years – an ill-timed shift for a child whose life has already been in flux.

Further, the trial court's order deprived the child of the positive benefit of frequent contact with her extended family during this time of significant transition in her family life.  The opportunity to strengthen the child's relationships with extended family members who may serve as emotional support during the difficult change in the configuration of the child's immediate family is a further benefit of the current custodial situation the trial court was required to take into account in assessing whether altering the child's primary residence was advisable for her safety and welfare.  *Lenz*, 79 S.W.3d at 17; *Vernor*, 94 S.W.3d at 211.  The trial court appears to have granted little or no weight to this factor.

The trial court also abused its discretion in failing to consider the practical impact compliance with the trial court's order would impose both on Mother and the child.  While

---

[6] The parents quibble about which parent has spent the most time with the child since the separation.  They trade barbs about Mother's use of the child's grandmother as a babysitter on evenings out and father's use of nannies while working.  Father argues the evidence showed he was the "de facto" primary parent.  In reality, the evidence before the trial court suggested a nearly even split of parenting time with Father occasionally ceding some of his time to Mother and Mother occasionally ceding some of her time to Father and both parties occasionally seeking assistance with childcare from others.

Father correctly points out the trial court's order did not mandate Mother's relocation to Dallas, by removing Tulsa as a permissible primary residence for the child and ordering the child returned to Dallas during the interim between the rendition of the temporary orders and the final determination of conservatorship and possession, the trial court placed a new burden on Mother without any showing that the imposition of this burden was necessary for the safety and welfare of the child. Mother is employed in Tulsa with work hours that allow her personally to provide after-school care for the child. Mother's current employment in Tulsa, contributing to her ability to provide a better standard of living for the child, and work hours conducive to after-school care for the child should have been a significant consideration in the determination whether to alter the agreed temporary orders to impose a restriction of the primary residence of the child to Dallas during the pendency of the divorce proceedings. *See Cooper*, 333 S.W.3d at 661; *Lenz*, 79 S.W.3d at 17.

Finally, the trial court failed to give effect to the policy imperative that dictates the enforcement, to the degree possible, of agreements reached without judicial intervention. Public policy particularly favors the non-judicial resolution of disputes concerning the parent-child relationship. *See, e.g.,* TEX. CIV. PRAC. & REM. CODE ANN. § 154.002 (West 2011) (noting it is the public policy of Texas to "encourage the peaceable resolution of disputes, with special consideration given to disputes involving the parent-child relationship . . . ."). Here the trial court failed to give effect both to the agreement to a use a non-judicial mechanism for resolving disputes concerning the child's living arrangements before seeking the assistance of the Court and the agreement Tulsa was an appropriate choice for the child's primary residence.

The agreed temporary orders provided:

[B]efore either parent files a motion to modify these temporary orders and/ or in the event a parent has any concern and/or the parents disagree about any issue

–12–

relating to the child's living arrangement contemplated by these temporary orders, other than an emergency, the parents shall attend at least two (2) sessions with [a counselor named in the agreed temporary orders] (in person or telephonically)(or another agreed upon mental health professional or one recommended by [the counselor] if she is unavailable) to address and attempt to resolve these concerns without court intervention if possible.

It is undisputed Father did not abide by this procedure.[7]  In the absence of a threat to the child's safety or welfare, the trial court should not have altered the agreed temporary orders without resort to the mechanisms provided by the agreed temporary orders for resolving the dispute about the child's living arrangements.  *See, e.g., Zeifman v. Michels,* 212 S.W.3d 582, 593 (Tex. App.—Austin 2006, pet. denied) (trial court abused its discretion in ordering child to attend private school where parties had agreed child would attend public school and had provided in divorce decree that child's current teacher's recommendation would be followed if parties subsequently disagreed about education).

The trial court also abused its discretion in failing to give appropriate weight to the parties' agreement Tulsa was an appropriate primary residence for the child.  Father argues this agreement was intended to apply only during the 2013–2014 school year, as shown by the fact the agreed temporary orders "made provisions for possession and access during Thanksgiving and Christmas of 2013 and Spring Break of 2014, but [were] silent as to any future holiday or any summer periods of possession."  We cannot infer such an intention from the plain text of the agreed temporary orders.

---

[7] Father couches the dispute among the parties as one relating to education rather than the child's living arrangements.  He argues the parties were both entitled to make decisions about the child's education and could not agree on whether the child should attend school in Tulsa or Dallas.  He concludes because the agreed temporary orders did not address the manner in which disputes about education would be resolved if the parties disagreed, the trial court was authorized to modify the agreed temporary orders to resolve the dispute about the child's schooling.  The reality, however, is that Father's motion to modify the temporary orders expressly requested the trial court to change the child's living arrangements by removing Tulsa as a permissible location for the child's primary residence.  It asked the trial court to "[o]rder the child returned to Dallas County for purposes of establishing her primary residence and order the child to start school in Dallas County in the fall of 2014."

The agreed temporary orders included paragraphs that addressed undesignated periods of possession and the duration of the agreed temporary orders. The paragraph regarding undesignated periods of possession provided, "Amy Dupre Casanova shall have the right to possession of the child at all other times not specifically designated in this Possession Order for Mark Andrew Casanova." The paragraph regarding duration stated, "[t]he periods of possession ordered above apply to the child the subject of this suit while that child is under the age of eighteen years and not otherwise emancipated." Thus, the agreed temporary orders did in fact designate a parent entitled to exercise the right to possession after spring break in the year 2014. The text of the agreed temporary orders did not place any limitation on the duration of the parties' agreement that Tulsa was an appropriate primary residence for the child. The trial court abused its discretion in substituting its judgment on this matter for the agreement of the parents without a showing that the safety and welfare of the child dictated the removal of Tulsa as an acceptable primary residence for the child.

## IV. FORM OF RELIEF

In a broad prayer for relief, Mother requests we order the trial court to vacate its September 11, 2014 order in its entirety. Mother did not, however, challenge the entirety of the trial court's order in her petition for writ of mandamus. Because we conclude the trial court abused its discretion in ordering the child's primary residence restricted to Dallas beginning on January 1, 2015, we conditionally grant relator's petition for writ of mandamus. A writ will issue only in the event the trial court fails to vacate those portions of its September 11, 2014 order that modify conservatorship, possession, and access to the child; that modify the child's domicile and the right to designate the child's primary residence; or that alter child support contingent upon Mother's failure to relocate to Dallas County. Because Mother does not

challenge the remainder of the trial court's order and has not established the trial court abused its discretion with regard to the other portions of the September 11, 2014 order, we do not address the portions of the trial court's order requiring performance of a custody evaluation, denying temporary spousal support, declining to order mediation and exchange of sworn inventories, and allowing withdrawal of funds for the payment of attorney's fees. The trial court may leave its orders with regard to these matters in effect consistent with this Court's order.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

141166F.P05